UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

UNITED STATES OF AMERICA,

Plaintiff,

v.

APPROXIMATELY $2,652,928.19 (US) FORMERLY DEPOSITED IN ACCOUNT NUMBER 657036698 HELD AT JP MORGAN CHASE BANK, N.A., IN THE NAME OF ALWAYS MEDICAL CENTER CORP, SEIZED ON OR ABOUT APRIL 25, 2025, PURSUANT TO JUDICIAL WARRANT,

and

APPROXIMATELY $569,955 (US) FORMERLY DEPOSITED IN ACCOUNT NUMBER 693886569 HELD AT JP MORGAN CHASE BANK, N.A., IN THE NAME OF ALWAYS MEDICAL CENTER CORP, SEIZED ON OR ABOUT APRIL 25, 2025, PURSUANT TO JUDICIAL WARRANT,

Defendants *in Rem*.

# VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, the United States of America, by and through its undersigned counsel, alleges as follows:

## I. NATURE OF THE ACTION

1. This is a civil action *in rem* brought pursuant to 18 U.S.C. § 981(a)(1)(C) and the procedures set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset

Forfeiture Actions, the Federal Rules of Civil Procedure, to judicially forfeit the Defendants *in Rem*, more fully described as follows (collectively, "Defendant Assets"):

(a) Approximately $2,652,928.19 (US) formerly deposited in account number 657036698 held at JP Morgan Chase Bank, N.A., in the name of Always Medical Center Corp ("Subject Account 1"), which was seized on or about April 25, 2025, pursuant to judicial warrant, to include accrued interest ("Defendant Asset 1"), and

(b) Approximately $569,955 (US) formerly deposited in account number 693886569 held at JP Morgan Chase Bank, N.A., in the name of Always Medical Center Corp ("Subject Account 2"), which was seized on or about April 25, 2025, pursuant to judicial warrant, to include accrued interest ("Defendant Asset 2").[1]

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction over this subject matter. *See* 28 U.S.C. §§ 1345, 1355(a); 18 U.S.C. § 981(a)(1).

3. This Court has *in rem* jurisdiction over the Defendant Assets. *See* 28 U.S.C. §§ 1345, 1355(b).

4. Venue for this action is proper in this District because acts or omissions giving rise to the forfeiture occurred in the Southern District of Florida, and because this is the same District where the Defendant Assets were brought upon seizure. *See* 28 U.S.C. §§ 1355(b)(1), 1395; 18 U.S.C. § 981(h).

## III. FACTUAL ALLEGATIONS

At all times material to this civil action *in rem*:

### A. The Medicare Program

5. The Medicare Program ("Medicare") was a federal health care program that provided

[1] All dates and amounts referenced in this Verified Complaint are approximate.

free or below-cost health care benefits to individuals who are 65 years of age or older or disabled. The benefits available under Medicare were governed by federal statutes and regulations.

6. The United States Department of Health and Human Services ("HHS"), through its agency the Center for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.

7. Individuals who received benefits under Medicare were commonly referred to as "Medicare beneficiaries."

8. Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b).

9. Medicare was subdivided into four program "parts," which were: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).

10. Medicare Part B covered, among other things, Cellular and/or Tissue-Based Products (CTPs), which were often referred to as skin substitutes or skin substitute grafts.

11. Medicare claims for Part B services were processed and paid by Medicare Administrative Contractors ("MAC(s)"), which contracted with CMS to administer parts of Medicare in specific geographic jurisdictions.

12. Physicians, clinicians, health care facilities, and suppliers that enrolled in Medicare and delivered services to Medicare beneficiaries were referred to as Medicare "providers."

13. To enroll as a Medicare provider, physicians, clinicians, health care facilities, and suppliers were required to complete a Medicare Provider Enrollment Application (CMS-855 form).

14. Applicants were required to have a valid National Provider Identifier (NPI), which was a 10-digit, universal, lifetime identifier for healthcare providers, to enroll as a Medicare provider.

15. Applicants were required to provide identifying information, practice locations, correspondence addresses, billing agency details, and a signed certification statement.

16. Applicants were required to certify that they would comply with all Medicare laws, regulations, and policies regarding reimbursement.

17. Applicants were required to submit their Medicare enrollment application using the online Internet-based CMS Provider Enrollment, Chain, and Ownership System (PECOS) or by mailing the appropriate CMS-855 form to the MAC for their geographic region.

18. The PECOS was the online Medicare enrollment management system maintained by CMS. The platform allowed physicians, clinicians, health care facilities, and suppliers to electronically enroll as Medicare providers or suppliers. Users could also utilize PECOS to renew enrollment, withdraw from the program, report record changes, and sign documentation. While MAC(s) processed the initial applications, PECOS served as the final repository for all Medicare provider enrollment data.

16. Upon approval of a Medicare Enrollment Application, Medicare assigned an enrolled Medicare provider a Provider Transaction Access Number (PTAN), which was referred to as a Medicare "provider number."

17. A Medicare provider was authorized to submit claims to Medicare for reimbursement of medically necessary covered services rendered to Medicare beneficiaries.

19. To receive Medicare reimbursement for medically necessary covered services, Medicare providers were required to file a claim electronically or submit a CMS-1500 or UB-92 form to their MAC.

20. To be valid, a Medicare claim was required to include, among other things, the beneficiary's name and Medicare Beneficiary Identifier (MBI), the services provided, the dates and costs of the services provided, the diagnostic and procedural codes validating medical necessity, and the name and NPI of the ordering or prescribing physician.

21. Providers could use their respective MAC internet-based portals to submit Medicare claims electronically.

22. Medicare providers were legally required to submit claims only for services that were rendered and that meet Medicare's criteria for being reasonable and medically necessary.

23. Medicare providers were required to submit a CMS-588 Electronic Funds Transfer (EFT) Authorization Agreement and a voided check or letter from their financial institution with their enrollment application to receive Medicare claims reimbursement payments electronically.

24. All Medicare reimbursement payments were transmitted directly to a Medicare provider's financial institution, whether the underlying claims were submitted electronically or on paper.

**B. <u>Always Medical Center Corp</u>**

25. Always Medical Center Corp ("Always Medical") was a Florida corporation with its principal office address listed as 10300 SW 72nd Street, Suite 272-2, Miami, Florida, 33173, which is within the Southern District of Florida.

26. According to Florida Department of State Division of Corporations records, Always Medical was incorporated on or about September 5, 2023 (Document number P23000064087; FEI/EIN 93-4943093).

27. Always Medical's Medicare enrollment became effective on November 1, 2024. Individual One was listed as Always Medical's owner, director, managing employee, and authorizing official.

28. As part of its Medicare provider enrollment application, Always Medical submitted a voided check and an EFT Authorization Agreement for Subject Account 1. The EFT agreement bore a signature purporting to be that of Individual One as Always Medical's authorized official.

### C. Subject Account 1

29. On August 5, 2024, Individual One opened Subject Account 1 in Always Medical's name at a JP Morgan Chase Bank, N.A. branch on West Bird Road in Miami, Florida.

30. Individual 1 was listed as President of Always Medical on Subject Account 1's opening documents.

31. Individual 1 was listed as Subject Account 1's sole signature authority.

### D. Subject Account 2

32. On January 23, 2025, Individual One opened Subject Account 2 in Always Medical's name at a JP Morgan Chase Bank, N.A. at a branch in Miramar, Florida.

33. Individual 1 was listed as President of Always Medical on Subject Account 2's opening documents.

34. Individual 1 was listed as Subject Account 2's sole signature authority.

### E. Medicare Fraud Scheme

35. From on or about December 2, 2024, through on or about February 14, 2025 ("relevant period"), Individual 1, with co-conspirators, submitted and/or caused Always Medical to submit false and fraudulent claims totaling $13,662,471 (US) to Medicare for skin substitute grafts that were not medically necessary and were not provided to Medicare beneficiaries.

36. All Medicare claims submitted by Always Medical during the relevant period designated the identical set of skin substitute graft diagnosis codes for claimed Medicare beneficiaries.

37. None of the Medicare beneficiaries listed on Always Medical's claims submitted during the relevant period had a medical need for skin substitute grafts, nor did they request or receive any skin substitute graft treatment.

38. All Medicare claims submitted by Always Medical during the relevant period listed Doctor 1 as the referring provider.

39. Doctor 1 never examined or treated any Medicare beneficiary listed on Always Medical's claims submitted during the relevant period.

40. Doctor 1 practiced general medicine and had never heard of Always Medical. Furthermore, Doctor 1 never examined or treated any of Always Medical's claimed beneficiaries, nor did he/she see any patients after October 5, 2023. Finally, Doctor 1 has never prescribed skin substitute grafts and never authorized Always Medical to use his/her NPI for Medicare billing

**F. Defendant Assets**

**Defendant Asset 1**

41. Between February 18 and March 12, 2025, Subject Account 1 received $6,547,345 (US) in Medicare reimbursement payments for claims submitted by Always Medical during the relevant period. This accounted for 99.84% of Subject Account 1's total deposits during this period.

42. An analysis conducted in accordance with generally accepted accounting principles demonstrated that, as of April 25, 2025, Subject Account 1's entire balance of $2,652,928.19 (US) was fully traceable to fraudulently procured Medicare reimbursement payments.

43. On April 28, 2025, federal law enforcement agents served a judicial warrant on JP Morgan Chase Bank, N.A. for all principal, deposits, interest, dividends, and other amounts credited to, and/or formerly on deposit in, the Subject Account 1.

44. Pursuant to the judicial warrant, JP Morgan Chase Bank, N.A. remitted $2,652,928.19 (US) to federal law enforcement agents accordingly.

45. Pursuant to the judicial warrant, the Federal Bureau of Investigation seized $2,652,928.19 (US), which constitutes the Defendant Asset 1.

**Defendant Asset 2**

46. Between February 18 and March 12, 2025, Subject Account 2 received $1,350,000 (US) from Account 1. This accounted for 99.95% of Subject Account 2's total deposits during this period.

47. An analysis conducted in accordance with generally accepted accounting principles demonstrated that, as of April 25, 2025, Subject Account 2's entire balance of $569,955 (US) was fully traceable to fraudulently procured Medicare reimbursement payments.

48. On April 28, 2025, federal law enforcement agents served a judicial warrant on JP Morgan Chase Bank, N.A. for all principal, deposits, interest, dividends, and other amounts credited to, and/or formerly on deposit in, Subject Account 2.

49. Pursuant to the judicial warrant, JP Morgan Chase Bank, N.A. remitted $569,955 (US) to federal law enforcement agents accordingly.

50. Pursuant to the judicial warrant, the Federal Bureau of Investigation seized $569,955 (US), which constitutes Defendant Asset 2.

## IV. BASIS FOR FORFEITURE

51. Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a specified unlawful activity or a conspiracy to commit such offense is subject to civil forfeiture.

52. Pursuant to 18 U.S.C. § 1956(c)(7)(F), any act or activity constituting an offense involving a "Federal health care offense" constitutes a specified unlawful activity.

53. Pursuant to 18 U.S.C. § 24(a)(1), a violation of, or a conspiracy to violate, 18 U.S.C. § 1347 (Health Care Fraud) is a "Federal health care offense."

54. Pursuant to 18 U.S.C. § 1347 it is a crime for anyone, in connection with the delivery of any health care benefits, items, or services, to knowingly and willingly execute, or attempt to execute, a scheme or artifice: (1) to defraud any health care benefit program; or (2) to obtain, by means of

materially false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program.

**FIRST CLAIM**
**Proceeds of Conspiracy to Commit Health Care Fraud**
**18 U.S.C. § 981(a)(1)(C)**

55. The factual allegations in paragraphs 1 through 54 are re-alleged and incorporated by reference as if fully set forth herein.

56. As set forth above, the Defendant Assets are property that constitutes or is derived from proceeds traceable to a conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349, which is a specified unlawful activity pursuant to 18 U.S.C. § 1956(c)(7)(F).

57. Accordingly, the Defendant Assets are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

**SECOND CLAIM**
**Proceeds of Health Care Fraud**
**18 U.S.C. § 981(a)(1)(C)**

58. The factual allegations in paragraphs 1 through 54 are re-alleged and incorporated by reference as if fully set forth herein.

59. As set forth above, the Defendant Assets are property that constitutes or is derived from proceeds traceable to health care fraud in violation of 18 U.S.C. § 1347, which is a specified unlawful activity pursuant to 18 U.S.C. § 1956(c)(7)(F).

60. Accordingly, the Defendant Assets are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

**WHEREFORE**, the United States of America prays that notice issue on the Defendant Assets; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that a warrant of arrest *in rem* issue according to law; that judgment be entered declaring that the Defendant Assets be forfeited for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By: ______________________________

Daren Grove (Court No. A5501243)
Assistant United States Attorney
E-mail: daren.grove@usdoj.gov
500 E. Broward Boulevard, Office 822
Fort Lauderdale, Florida 33394
Telephone: 954.660.5774
Facsimile: 954.356.7180

**VERIFICATION**

I, Steffi Rodriguez, hereby verify and declare, under penalty of perjury, that I am a Special Agent with the Federal Bureau of Investigation (FBI) and that the foregoing factual allegations are true and correct to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement agents, as well as my investigation of this case, together with others, as a Special Agent of the FBI.

Executed on this 18th day of June 2026.

Steffi Rodriguez
Special Agent, Federal Bureau of Investigation